

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

NORTHWESTERN PHYSICIANS AND
SURGEONS, LLC, et al.,

          RELATORS,

VS.

CASE NO: 08 C 633

Judge Holderman

Magistrate Judge Schenkier

NORTHWESTERN MEMORIAL
HEALTHCARE CORPORATION
Serve:
Carol M. Lind,
240 E. Ontario St., Ste 500,
Chicago, IL 60611

**TO BE FILED
IN CAMERA
AND UNDER SEAL
PURSUANT TO MANDATORY
STATUTORY REQUIREMENTS
OF 31 USC § 3730**

NORTHWESTERN MEMORIAL
HOSPITAL
Serve:
Carol M. Lind,
240 E. Ontario St., Ste 500,
Chicago, IL 60611

FILED

JUL 3 0 2009
JUL 30, 2009
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

NORTHWESTERN MEMORIAL
FOUNDATION
Serve:
Carol M. Lind,
240 E. Ontario St., Ste 500,
Chicago, IL 60611

NORTHWESTERN MEDICAL
FACULTY FOUNDATION
Serve:
Danae K. Prousis,

1

680 North Lakeshore Drive, # 1118,
Chicago, IL 60611


Dean M. Harrison
Serve:
Place of Employment
Northwestern Memorial Hospital


Peter J. McCanna
Serve:
Place of Employment
Northwestern Memorial Hospital


Dennis Murphy
Serve:
Place of Employment
Northwestern Memorial Hospital


Jim Foody, MD
Serve:
Place of Employment
Northwestern Medical Faculty
Foundation


James Schroeder, MD
Serve:
Place of Employment
Northwestern Medical Faculty
Foundation
675 North St. Clair
Galter 14-100
Chicago, IL 60611


Charles Watts, MD
Serve:
Place of Employment
Northwestern Memorial Hospital
251 East Huron
Feinberg 3-710
Chicago, IL 60611

2

Gary Martin, MD
Serve:
Place of Employment
Northwestern Memorial Hospital
675 North St. Clair
Galter 18-200
Chicago, IL 60611

J. Larry Jameson, MD
Serve:
Place of Employment
Northwestern University Medical
School, Feinberg School of Medicine
675 North St. Clair
Galter 14-100
Chicago, IL 60611

Nathaniel Soper, MD
Serve:
Place of Employment
Northwestern Memorial Hospital
675 North St. Clair
Galter 17-250
Chicago, IL 60611

**FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 31 USC § 3729 ET SEQ., THE FEDERAL FALSE CLAIMS ACT, THE ILLINOIS WHISTLEBLOWER ACT, THE ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT AND THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**

Come Now Relators, Northwestern Physicians and Surgeons, LLC, and

Steven J. DeAngeles, M.D., Chairman and in his personal capacity, by and through

their counsel of record, and for their causes of action under the False Claims Act,

31 USC § 3729, et seq., the Illinois Whistleblower Protection Act, the Illinois

Insurance Claims Fraud Prevention Act and the Illinois Consumer Fraud and

3

Deceptive Business Practices Act, against the Defendants Northwestern
Memorial Hospital, et al., state as follows:

## Type of Action

1.  This is an action to recover damages and civil penalties on behalf of
    the United States of America arising out of the false claims presented
    for payment by Phoebe under the Federal Medicare Program. This
    action arises under the provisions of Title 31 U.S.C. § 3729, *et seq.*,
    popularly known as the False Claims Act, which provides that the
    United States District Courts shall have exclusive jurisdiction of
    actions brought under that Act.

2.  Section 3732(a) of the Act provides that "Any action under section
    3730 may be brought in any judicial district in which the defendant
    or, in the case of multiple defendants, any one defendant can be found,
    resides, transacts business, or in which any act proscribed by section
    3729 occurred."

3.  The Act provides that the action be filed in camera and under seal and
    remain under seal until further order of the Court. 31 USC §
    3730.

## Parties

4.  Northwestern Physicians and Surgeons, LLC (NPS) is a limited liability
    corporation organized under the laws of the State of Illinois and
    operating as a group of private practice physicians. Some of the
    information in this complaint has come in through the efforts of

4

individual physicians in this corporation, and the corporation, to the extent allowed by law, claims status as a Relator in this matter.

5.    Steven J. DeAngeles is a board-certified internal medicine physician, and executive director of NPS whose practice is located at 200 South Michigan Avenue, Suite 830, Chicago, IL. He has direct and personal knowledge of the information related herein, and prior to filing this complaint under the False Claims Act, made proper evidentiary disclosures to the United States Department of Justice, and the Illinois Attorney General's Office.

6.    Northwestern Memorial Healthcare (hereafter NMHC) is a corporate entity in good standing with the State of Illinois. It may be served with process through its registered agent, Carol M. Lind, 240 E. Ontario St., Ste 500, Chicago, IL 60611. NMHC is the parent corporation for Northwestern Memorial Hospital.

7.    Northwestern Memorial Hospital (hereafter NMH) is a private, not-for-profit healthcare corporation organized under the laws of the State of Illinois and currently in good standing, whose registered agent for service of process is Carol M. Lind, 240 E. Ontario St., Ste 500, Chicago, IL 60611. At all times relevant herein, Northwestern Memorial Hospital made claims for payment for medical and hospital services to the United States Government and also sought payments from Illinois State Medicaid. At all times relevant herein, Northwestern Memorial Hospital also made claims for payment of

5

medical and hospital services to private insurers and patients.

8.    Northwestern Medical Faculty Foundation (hereafter NMFF) is or purports to be a not-for-profit medical foundation separate from, but affiliated with Northwestern Memorial Hospital. It can be served with process through its registered agent, Danae K. Prousis, 680 North Lakeshore Drive, # 1118, Chicago, IL 60611. It employs more than 1400 physicians who are all given a faculty appointment at Northwestern University's Medical School (Feinberg School of Medicine, which is not a named party in this action).

9.    Northwestern Memorial Foundation (NMF) is a corporate not-for-profit arm of Northwestern Memorial Hospital and can be served with process through its registered agent for service of process, Carol M. Lind, 240 E. Ontario St., Ste 500, Chicago, IL 60611. At all times relevant herein the foundation acted on the direction of Northwestern Memorial Hospital or Northwestern Memorial Healthcare Corporation and was its agent for purposes of providing grants to the parties named as defendants herein.

10.   Jim Foody, MD, is the Vice Chairman of the Department of Medicine at Northwestern Memorial Hospital and at all times relevant herein was employed by the defendant Faculty Foundation.

11.   Gary Martin, MD, is the Director of the Department of Medicine at Northwestern Memorial Hospital and at all times relevant herein was employed by the defendant Faculty Foundation.

12. James Schroeder, MD, is the President and Chief Executive Officer of defendant Faculty Foundation.

13. Charles Watts, MD, is the Chief Medical Officer of Northwestern Memorial Hospital.

14. Gary Martin, MD, is the Director of General Internal Medicine at Northwestern Memorial Hospital.

15. J. Larry Jameson, MD, is the Dean of Northwestern University Medical School (Feinberg School of Medicine) and was formerly Chairman of the Department of Medicine at Northwestern Memorial Hospital.

16. Dean M. Harrison is President and Chief Executive Officer of Northwestern Memorial HealthCare. He is responsible for the hospital and its subsidiaries. At all times relevant herein Mr. Harrison directed and controlled the daily operations of the facility and oversaw its strategic plan.

17. Peter J. McCanna is Executive Vice President Administration and Chief Financial Officer (CFO) of Northwestern Memorial HealthCare, and its principal subsidiary, Northwestern Memorial Hospital.

18. Dennis Murphy is the Chief Operating Officer and Executive Vice President of Northwestern Memorial HealthCare. He is responsible for hospital operations, and the Northwestern Memorial Physicians Group.

**Jurisdiction**

19. The Court has subject matter jurisdiction to entertain this action

7

under 28 U.S.C. §§ 1331 and 1345. The Court has supplemental jurisdiction over the state whistleblower law claims, and the state insurance claims fraud and state consumer fraud and deceptive practices claims pursuant to 28 USC § 1367. The Court may exercise personal jurisdiction over the defendant pursuant to 31 U.S.C. § 3732(a) and 740 ILCS § 175.

## Venue

20. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732, because the defendant transacted business in this district and committed acts within this district that violated 31 U.S.C. § 3729, and because a substantial part of the events at issue in this case occurred in this district.

## The False Claims Act

21. The False Claims Act provides, in pertinent part, that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

* * *

8

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

(b) For purposes of this section, the terms "knowing" and "knowingly mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

## The Illinois Whistleblower Protection and Reward Act

22.     740 ILCS § 175 et seq. provides a cause of action for Relators under

Illinois State Law.  The law provides in relevant part:

a.  § 3. False claims.

(a) Liability for certain acts.  Any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid;

9

(4) has possession, custody, or control of property or money used, or to be used, by the State and, intending to defraud the State or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) authorized to make or deliver a document certifying receipt of property used, or to be used, by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the State, or a member of the Guard, who lawfully may not sell or pledge the property;

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State;

(8) knowingly takes adverse employment action against an employee for disclosing information to a government or law enforcement agency, if the employee has reasonable cause to believe that the information discloses a violation of State or federal law, rule, or regulation; or

(9) knowingly retaliates against an employee who has disclosed information in a court, an administrative hearing, before a legislative commission or committee, or in another proceeding and discloses information, if the employee has reasonable cause to believe that the information discloses a violation of State or federal law, rule, or regulation,

is liable to the State for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the State for the costs of a civil action brought to recover any such penalty or damages.

b. Knowingly is defined under the statute as:

(b) Knowing and knowingly defined. As used in this Section, the terms "knowing" and "knowingly" mean that a person, with respect to information:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

c. A Claim is defined under the statute as:

(c) Claim defined. As used in this Section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the State provides any portion of the money or property which is requested or demanded, or if the State will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. A claim also includes a request or demand for money damages or injunctive relief on behalf of an employee who has suffered an adverse employment action taken in violation of paragraphs (8) or (9) of subsection (a).

23.     Like the Federal False Claims Act, the Whistleblower Act provides for the filing of civil actions by relators.

24.     740 ILCS § 175/4 provides in relevant part:

(b) Actions by private persons. (1) A person may bring a civil action for a violation of Section 3 for the person and for the State. The action shall be brought in the name of the State. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

(2) A copy of the complaint and written disclosure of substantially all

11

material evidence and information the person possesses shall be served on the State. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The State may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

(3) The State may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this Section until 20 days after the complaint is unsealed and served upon the defendant.

**The Illinois Insurance Claims Fraud Prevention Act**

25.    740 ILCS § 92/1, et seq. provides a cause of action for Relators under

Illinois State Law. The law provides in relevant part:

§ 5  Patient and client procurement.

(a) Except as otherwise permitted or authorized by law, it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer.

740 ILCS § 92/5(a).

26.    740 ILCS § 92/5(b) provides in relevant part:

(b) A person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim

12

for compensation under a contract of insurance. The court shall have the power to grant other equitable relief, including temporary injunctive relief, as is necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public. The penalty prescribed in this subsection shall be assessed for each fraudulent claim upon a person in which the defendant participated.

27.    Article 46 of the Illinois Criminal Code provides that insurance claim fraud occurs when a person:

Knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company. 720 ILCS § 5/46-1.

28.    Like the Federal False Claims Act and the Illinois Whistleblower Act, the Illinois Insurance Claims Fraud Prevention Act provides for the filing of civil actions by relators.

29.    740 ILCS § 92/15 provides in relevant part:

(a) An interested person . . . may bring a civil action for a violation of this Act for the person and for the State of Illinois. The action shall be brought in the name of the State. The action may be dismissed only if the court and the State's Attorney or the Attorney General, whichever is participating, gives written consent to the dismissal stating their reasons for consenting.

(b) A copy of the complaint and a written disclosure of substantially all material evidence and information the person possesses shall be served on the State's Attorney and Attorney General. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The State's Attorney or Attorney General may elect to intervene and

13

proceed with the action within 60 days after he or she receives both the complaint and the material evidence and information. If more than one governmental entity elects to intervene, the State's Attorney shall have precedence.

(c) The State's Attorney or Attorney General may, for good cause shown, move the court for extensions of the time during which the complaint shall remain under seal under subsection (b). The motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this Section until 20 days after the complaint is unsealed and served upon the defendant.

740 ILCS § 92/15.

## FEDERAL PROGRAMS AFFECTED BY FALSE CLAIMS AT ISSUE HERE

### The Medicare Program

30.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services for elderly and disabled Americans. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-4. Most hospitals, including Northwestern, derive a substantial portion of their revenue from the Medicare Program.

31.     HHS is responsible for the administration and supervision of the Medicare Program. CMS, an agency of HHS, is directly responsible for the administration of the Medicare Program.

14

32.    Under the Medicare Program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility for participating in the Medicare Program.  However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients.  Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

33.    As detailed below, Northwestern submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

34.    To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries."   42 U.S.C. §1395h.   Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

35.    Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays.  42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments electronically on a CMS Form UB-92 (formerly called a HCFA Form UB-92).

15

36.     As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually form CMS-2552 (formerly called a HCFA-2552), more commonly known as the Hospital Cost Report. Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

37.     After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. §1395g(a); 42 C.F.R. §413.20. *See also* C.F.R. § 405.1801(b)(1). Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.50 and 413.64(f)(i).

38.     Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year. On the Hospital Cost Report, the Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are

16

subtracted to determine the amount due to the Medicare Program or the amount due to the provider.

39.     Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries, had the right to audit the Hospital Cost Reports and financial representations made by Northwestern to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  That right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made.  42 C.F.R. §413.64(f).

40.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

41.     At all times relevant to this Complaint, the responsible provider official was required to certify, in pertinent part:

to the best of my knowledge and belief, it (the Hospital Cost Report) is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.


I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

17

Form HCFA-2552-92.

42.     In or about 1996, the Hospital Cost Report was revised to include the
        following notice:

        Misrepresentations or falsification of any information
        contained in this cost report may be punishable by criminal,
        civil and administrative action, fine and/or imprisonment
        under federal law. Furthermore, if services identified in this
        report were provided or procured through the payment
        directly or indirectly of a kickback or where otherwise illegal,
        criminal, civil and administrative action, fines and/or
        imprisonment may result.

43.     Defendants NMHC, NMH, and NMFF are and were at all relevant times
        familiar with the laws and regulations governing the Medicare
        Program, including, with respect to NMH, requirements relating to the
        completion of cost reports.

44.     A hospital is required to disclose all known errors and omissions in its
        claims for Medicare reimbursement (including its cost reports) to its
        fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a
        duty to disclose known errors in cost reports:

        Whoever . . . having knowledge of the occurrence of any event
        affecting (A) his initial or continued right to any such benefit
        or payment . . . conceals or fails to disclose such event with an
        intent fraudulently to secure such benefit or payment either
        in a greater amount or quantity than is due or when no such
        benefit or payment is authorized . . . shall in the case of such a

18

. . . concealment or failure . . . be guilty of a felony.

45.     Hospital Cost Reports submitted by Northwestern were, at all times relevant to this Complaint, signed by Northwestern employees who attested, among other things, to the certification quoted above.

### The Medicaid Program

46.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal government provides matching funds and ensures that states comply with minimum standards in the administration of the program.

47.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation ("FPF"), 42 U.S.C. §§ 1396, et seq.

48.     Each state's Medicaid program must cover hospital services. 42 U.S.C. §1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

49.     Illinois provider hospitals participating in the Medicaid program file annual cost reports with the state's Medicaid fiscal intermediary, in a protocol similar to that governing the submission of Medicare cost reports. Provider hospitals participating in the Medicaid program file a copy of their Medicare cost reports with the Medicaid program,

19

which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement.

50.    At all material times, the Medicaid Program was administered in the State of Illinois by the Illinois Department of Healthcare and Family Services Bureau of Health Finance to serve as paying agent to receive, adjudicate, and pay Medicaid claims submitted by Medicaid participating providers in the State of Illinois. Providers incorporate the same type of financial data in their Medicare cost reports as contained in their Medicaid cost reports, and include data concerning the number of Medicaid patient days at a given facility.

51.    The Illinois Medicaid program uses the Medicaid patient data in the cost report to determine the reimbursement to which the facility is entitled. The facility receives a proportion of its costs equal to the proportion of Medicaid patients in the facility.

52.    Where a provider submits the Medicare cost report with false or incorrect data or information to Medicaid, this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

53.    Northwestern sought reimbursement from the Illinois Medicaid program for the time period pertinent to this Complaint.

20

54.     Most health care providers which have entered into provider agreements with the Secretary, as has the Hospital, are reimbursed through the Prospective Payment System (PPS). This system reimburses hospitals not for their actual incurred costs but for costs based on prospectively fixed rates for each category of treatment.

55.     Hospitals receive payment for the services they perform on Medicare beneficiaries based upon the "diagnosis related group" (DRG) within which the service falls. 42 C.F.R. § 412.60 (2001). The payment rates for the upcoming federal fiscal year (FFY) for each DRG are published in the Federal Register, first in the form of a proposed rule and then in the form of a final rule published on or about August 1 for the FFY beginning on October 1 of that year. 42 U.S.C. § 1395ww(d)(6); 42 C.F.R. §412.8. This system notifies hospitals in advance of the amount of payment they should expect to receive per patient for each DRG.

## The Stark Law

56.     A section of the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing healthcare items or services)from submitting Medicare claims for payment for certain designated health services based on patient referrals from physicians having an improper "financial relationship" (as defined in the statute) with the hospital. The statute

21

states that no Medicare payment may be made for designated health services provided in violation of the statute. 42 U.S.C. § 1395nn (g) (1).

57.     The regulations implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

58.     In enacting the Stark Statute, Congress found that improper financial relationships between physicians and entities to whom they refer patients can compromise the physicians' professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality. Congress relied upon various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those providers' services than similarly situated physicians who did not have such relationships. The statute was designed to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services.

59.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship

22

with the clinical lab provider. See Omnibus Budget Reconciliation Act of 1989, P.L. 101-239.

60.   In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services. See Omnibus Budget Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

61.   As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. See 42 U.S.C. § 1395nn(h)(6).

62.   In pertinent part, the Stark Statute provides:

(a) Prohibition of certain referrals.

(1) In general. Except as provided in subsection (b), if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then --

23

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this title, and

(B) the entity may not present or cause to be presented a claim under this title or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (emphasis added).

63.     The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician. The statute's exceptions then identify specific relationships that will not trigger its referral and billing prohibitions.

64.     One such relationship is an employment relationship between a hospital and a physician, but the relationship will only qualify for the exception if the amount of the remuneration paid to the doctor (1) is consistent with the fair market value of the doctor's services, (2) would be commercially reasonable even if no referrals were made to the hospital, and (3) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician.

24

## The Antikickback Statute

65.     The Medicare and Medicaid Patient Protection Act of 1987, as
amended, 42 U.S.C. §1320a-7b (the "Antikickback Statute"), provides
for criminal penalties for certain acts impacting Medicare and state
health care (e.g., Medicaid) reimbursable services.

66.     Section 1320a-7b(b) provides:

> (1) whoever knowingly and willfully solicits or receives any
> remuneration (including any kickback, bribe or rebate (directly or
> indirectly, overtly or covertly, in cash or in kind –
>
> > (A) in return for referring an individual to a person for the
> > furnishing or arranging for the furnishing of any item or
> > service for which payment may be made in whole or in part
> > under [Medicare] or a State health care program, or
> >
> > (B) in return for purchasing, leasing, ordering, or arranging
> > for or recommending purchasing, leasing, or ordering any
> > good, facility, service, or item for which payment may be
> > made in whole or in part under [Medicare] or a State health
> > care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be
> fined not more than $25,000 or imprisoned for not more than five
> years, or both.

Furthermore, this subsection provides:

(2) whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under [Medicare] or a State health care program, or

> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under [Medicare] or a State health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

67. The Antikickback Statute prohibits certain solicitations or receipt of remuneration and the offer or payment of certain remuneration.

68. Section 1320a-7b(b)(2) has generally been applied to broker-style arrangements, whereby an individual offers remuneration to another individual for the purpose of recommending or referring an individual for the furnishing or arranging for an item or service.

69. In an Antikickback Statute analysis, it is immaterial whether remuneration induces one in a position to refer or recommend. It is sufficient that the remuneration may induce one to refer or recommend. *United States v. Greber*, 760 F.2d 68, 71 (3rd Cir.), cert. denied, 474 U.S. 988 (1985).

26

70. Under **Greber**, it is also irrelevant that there are other legitimate reasons for the remuneration. If one purpose is to induce referrals, then the Antikickback Statute is violated. *Id.* at 71.

<u>**Northwestern Memorial Hospital and Its Organizations**</u>

71. On information and belief the organization of the hospital and its various service units, including affiliated units, is as shown in the following graphics:



Figure 1: Organizational Structure of Northwestern Memorial Healthcare Corporation and its affiliated entities.

27



Figure 2: The organization structure of Northwestern Medical Faculty Foundation.

72.    Northwestern Memorial Hospital.  Defendant Northwestern Memorial Hospital provides services to patients across a broad spectrum of the Chicago and surrounding community.  In 2005 it had 42,202 admissions, and in 2006 it had 43,312 admissions.  On any given day between 2005 and 2006, the average daily census was between 579 and 596 patients.  The average length of stay was approximately 4.8 days.  These numbers do not reflect outpatient services.

28

73.     Defendant NMFF has over 1400 physicians and those physicians work out of more than 50 offices in the Chicago metropolitan area.

74.     Northwestern Memorial Healthcare Corporation has 18 managed care contracts, among other contractual relationships with providers in the Chicago Metropolitan area.

75.     Defendant Northwestern Memorial Foundation purports to give more than $18.6 million in annual gifts to support hospital programs, while providing grants in excess of $47 million.  On information and belief over the past five years NMF or NMH has given more than $130,000,000 in grants to defendant NMFF.

76.     For some time Northwestern Memorial Hospital functioned with a staff of physicians that was at all times independent of the control of the hospital, acting as independent contractors, providing medical services in and on the campus of the hospital.

77.     Because it was associated with the Feinberg School of Medicine at Northwestern University, physicians who wished to be attending physicians at Northwestern Memorial Hospital had to secure a faculty appointment from the medical school.

78.     Northwestern Memorial Healthcare Corporation created a charitable foundation (defendant NMF).  The Hospital Foundation was designed to facilitate the ostensibly charitable mission of the hospital.

Northwestern University created its Faculty Foundation (defendant NMFF). The two entities (NMH and NMFF) are separate corporate entities, although, in practice, both often act on direction from NMHC and Northwestern University.

## BACKGROUND FACTS RELATED TO VARIOUS FALSE CLAIMS SCHEMES

79.    Some physicians elected to join defendant NMFF, while other physicians did not.

80.    Starting at some time after 1997, a series of changes occurred in the operation of the hospital. Physicians who were independent of NMFF were pressured to join the foundation.

81.    The Department of Medicine implemented rules which restricted the use of house staff (medical interns and residents). These residents could be apportioned to NMFF members, but not to physicians who were not members.

82.    This exposed independent physicians to call duties in the hospital and was one of many ways that physicians who were independent were pressured to join the foundation.

## The First Payment From NMHC/NMH to NMFF

83.    At some time prior to 2002 litigation was filed which resulted in an excess judgment against NMFF during 2002. Testimony by employees of the hospital apparently placed blame on NMFF physicians, and the

30

foundation incurred a significant monetary loss in the amount of approximately $30,000,000.

84.     Department chairmen (employed by NMFF) signed and sent a letter to the board of defendant NMHC saying that bad hospital management had led to the result and that certain hospital administrators should be terminated.

85.     On or about late 2002, the hospital, through its foundation, made an unrestricted gift or grant to NMFF to repay indirectly the malpractice judgment of the NMFF physicians, and provide for a significant portion of the malpractice premiums of NMFF physicians. The gift in the amount of $35,000,000 did not inure to the benefit of independent physicians who were not members of NMFF.

86.     The amount of the payment flowing from the hospital's foundation to the faculty foundation was significantly in excess of the amount necessary to pay the malpractice premiums.

87.     As a result, department of medicine and department of surgery department heads received significant raises, and apportioned the additional money amongst a very select group of NMFF physicians.

**The Free Rent Provided to NMFF Physicians In the Breast Center**

88.     At some time in 2000, Northwestern Memorial Hospital opened up a "breast center" in its facility.

31

89.    The purpose of the "breast center" was to locate the diagnostic and treatment facilities associated with breast cancer in one location.

90.    NMFF physicians enjoyed easy access to, and free use of the facilities in the breast center.

91.    Independent physicians were made to pay a diagnostic fee and an office rental fee if they saw any of their patients in the breast center.

92.    The provision of free rent to NMFF physicians was a form of inducement not available to physicians generally which was used to induce or capture outpatient imaging and other diagnostic referrals paid for under Medicare and Medicaid. In permitting free use of the Breast Center to NMFF physicians but denying that free use to independent physicians, the Northwestern Memorial Hospital and Northwestern Memorial Healthcare, Inc. have engaged in prohibited payments to physicians for the purpose of inducing referrals.

93.    In paying a significant portion of NMFF malpractice premiums through unrestricted grants from its agent and alter-ego foundation, Northwestern Memorial Hospital and Northwestern Memorial Healthcare, Inc. have engaged in prohibited payments to NMFF physicians for the purpose of inducing referrals.

**Chemotherapy Billing Fraud**

94. Relator DeAngeles treats patients who frequently receive chemotherapy.

95. On or about July, 2007, Relator was approached by a patient who fears for her personal safety if her name is disclosed, and will be described here as Patient X.

96. Patient X brought her billing statement to Dr. DeAngeles to show him an anomaly on her bill regarding the chemotherapy agent Abraxane.

97. On 1/8/2007, 1/16/2007, 1/23/2007, 2/6/2007, 2/13/2007, 2/20/2007, 3/6/2007, 3/13/2007, 3/20/2007, 4/4/2007, 4/11/2007, 4/17/2007, 5/1/2007 and 5/6/2007 – when she had her chemotherapy appointments in the morning – She received and was billed for 180 units of chemotherapy.

98. The patient's oncologist had prescribed 180 units and the bills from January through May were correct. At some time after the May 6, 2007 visit, Patient X began to receive her chemotherapy in the afternoon.

99. Thereafter she discovered that the billing records showed that she had received more than the 180 units of chemotherapy ordered, and in some cases, nearly one and half times the amount.

100. On 5/15/2007 Blue Cross and Blue Shield (and the patient) were charged for 192 units of Abraxane.

101. On 5/29/2007 Blue Cross and Blue Shield (and the patient) were charged for 261 units of Abraxane.

102. On 6/5/2007 Blue Cross and Blue Shield (and the patient) were charged for 230 units of Abraxane.

103. Patient X called and inquired of the hospital billing department about the billing discrepancy. She was concerned she was receiving more chemotherapy than her doctor was ordering for her.

104. The billing clerk informed her that she had only gotten the amount the physician ordered, but that at the end of the day, on the last patient of the day, there is a "rounding up" and that patient's insurer or Medicare always gets billed for whatever amount of chemotherapy is left over.

105. Thus, with respect to Patient X's bill, the billing record falsely stated that 282 units of medication were delivered, when in fact, only 180 units had been delivered.

106. The chemotherapy services are provided by the Oncology Department of Northwestern Medical Faculty Foundation. NMFF submits billings to Medicare, Tricare/Champus, Medicaid and private insurance.

107.   The purpose of the false billings is to permit Northwestern Medical Faculty Foundation to send false bills to Medicare, Medicaid, Tricare/Champus and private health insurers for outpatient chemotherapy.

**The Payments To NMFF For Cardiology Recruitment**

108.   On or about 2004 the Northwestern Memorial Hospital sought to upgrade its cardiac surgery program by adding a cardiac surgery group headed by Patrick M. McCarthy, a physician from the Cleveland Clinic Foundation.

109.   Doctor McCarthy and his group required a unique financial arrangement.

110.   McCarthy and his group negotiated a deal where they would be guaranteed at least $50,000,000 per year, irrespective of whether their employer, defendant NMFF made money, broke even, or lost money on their provision of services.

111.   NMFF worked out an arrangement with Northwestern Memorial Hospital where the Hospital, through its foundation, would agree to an arrangement known as the "delta factor plus one" for payment of McCarthy's services.

112.   Under the initial arrangement the hospital, the Hospital granted NMFF $50,000,000 to bring on a cardiovascular team led by McCarthy. Once

35

McCarthy was brought on the hospital continued its support of NMFF and McCarthy by agreeing to cover any loss incurred as a result of McCarthy and in addition, pay one dollar. This was contingent on McCarthy's continued work solely out of NMH. NMH essentially agreed that NMFF would never lose money on McCarthy (as long as McCarthy only worked at NMH facilities).

113.    The agreement appears to be a payment in cash in order to induce the provision of cardiac surgery services that will be paid for by Medicare and therefore violates the Antikickback Statute.

**The Hospitalists and Payments to NMFF from NMH/NMF**

114.    NMFF provides specialized physicians known as "hospitalists" to NMH.

115.    Although employed by NMFF, the purpose of the hospitalists is to permit NMH to directly affect the utilization of services by Medicare and Medicaid patients. Because of the remuneration arrangements between NMH and NMFF, the hospital has direct influence over, and the ability to control directly the utilization of inpatient services by hospitalists.

116.    NMH implemented bylaws changes that effectively make the hospitalists the primary care physician for all patients admitted to the medicine service.

117.    By virtue of being admitted to the facility, even if sent there by their primary care physician, the patient is seen by the hospitalists, and the hospitalists, not the patient's primary care doctor, make decisions about what tests are necessary and what tests will be done.

118.    When a physician who serves in the department of medicine and who is not a NMFF member has a patient admitted, because of the Part B rules, he cannot bill for a patient visit because the hospitalist has assumed this role.

119.    The purpose behind the hospitalist program is to limit the resources consumed by Medicare and Medicaid patients while maximizing, to the extent possible, the resources billed to privately paid and privately insured patients.

120.    Normally, a hospitalist would be either an independent contractor or an affiliated physician with a private practice who was employed directly by the hospital. Here the hospitalist is employed by the NMFF and defendant Northwestern Memorial Hospital, through its foundation, pays unrestricted grants amounting to upwards of 70% of the hospitalists' salaries, to NMFF. This money is given directly to the department of medicine, which is then divided up so as to pay the hospitalists salaries, among other things.

121.    NMFF is therefore beholden to the Hospital, and must carry out its utilization review and resource allocation policies.

37

122.   The payment of 70% of the hospitalists salaries from Northwestern Memorial Hospital and/or Northwestern Memorial Foundation is a payment in cash as an inducement to control or manage the healthcare services paid for by Medicare and Medicaid and is a violation of the Antikickback statute.

123.   The combined effect of the unrestricted grants for payment of medical malpractice premiums, payment for cardiology recruitment, rent deferral for breast center physicians, and payments to the hospitalists is a scheme of "grants" that effectively allow Northwestern Healthcare Corporation (including the hospital and the foundation) to capture all the profitable referrals for its hospitals and specialty centers from its captive physician group.  Since the physician practice is not owned directly by the hospital, the hospital must exercise indirect control over what appears, on paper anyway, to be an unaffiliated entity.

**Overbilling For Recovery Room Time**

124.   Outpatients who undergo surgery at Northwestern Memorial Hospital are being over-billed for recovery room time.

125.   One patient, Mr. Bernard Hornung, was in the recovery room for less than one hour but was billed in excess of five hours.

38

126. On information and belief this is an ongoing pattern of overbilling to Medicare, Medicaid, Champus/Tricare, Federal Employees Health Benefit Plan, and private insurance.

127. The net effect of the overbilling by NMFF has caused a strong influx of cash into NMFF, and news media reports indicate that their bond and credit ratings have soared in recent months.

## CAUSES OF ACTION

## COUNT I
## SUBMISSION OF FALSE CLAIMS TO MEDICARE
## (NMHC, NMH)

128. Relators incorporate by reference the substance of paragraphs 1 – 118 as if fully set forth herein.

129. The allegations in this count pertain to Northwestern Memorial Hospital and to its parent corporation, Northwestern Memorial Healthcare Corporation.

130. Defendants submitted cost reports for the years 1999 – 2006 to Medicare in order to obtain reimbursement of costs and payment of services rendered to Medicare patients.

131. From 2001 to the present, NMHC, through its agent NMH, has submitted claims for payment to Medicare for patients who received inpatient and outpatient services at Northwestern Memorial Hospital.

132. Defendants certified that their submissions were true, accurate and complete.

133. Defendants' certifications were not true, accurate and complete because:

    a. They did not truthfully disclose the nature of the relationship between NMFF and NMH with respect to the Cardiology physicians.

    b. They did not truthfully disclose the nature of the relationship between NMFF and NMH with respect to the payment of medical malpractice premiums.

    c. They did not truthfully disclose the nature of the relationship between NMFF, NMH, and the McCarthy group of cardiologists with respect to NMFF paying the McCarthy group an amount much greater than fair market value for the services of these physicians, where the payment from NMFF (a not-for-profit corporation) was being reimbursed by NMH under a "grant".

    d. They did not truthfully disclose the nature of the relationship between NMH and NMFF with respect to the rent deferral and lack of facility charges for NMFF physicians using the Breast Center.

    e. They did not truthfully disclose the nature of the relationships between the hospitalist employees of NMFF, NMF, and NMH with

40

respect to the payment of 70% of the costs of the hospitalists salaries by NMH through its foundation.

f.   They did not disclose the improper relationships prohibited by Stark and the Antikickback statute.

134.   Defendants knew, or in the exercise of reasonable care should have known that the cost reports were not true and accurate.

135.   Defendants presented or caused to be presented false claims to an officer of the United States or to an agent or fiscal intermediary of the United States to obtain payment.

136.   The United States made payments from December 2001 until the present to the defendants based on these false claims.

137.   As a result, the Treasury of the United States was damaged in an amount to be proved at trial and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relators NPS and DeAngeles demand judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Dollars ($5,000.00) and Ten Thousand Dollars ($10,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the

False Claims Act or any other applicable provision of law, including any alternate remedy, for their court costs and reasonable attorneys' fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT II
## ILLINOIS WHISTLEBLOWER PROTECTION AND REWARD ACT
## 740 ILCS § 175/3 ET SEQ.

138.     The Relators restate the allegations in Count I, *supra*, as if fully set forth herein.

139.     The allegations in this count pertain to Northwestern Memorial Hospital and to its parent corporation, Northwestern Memorial Healthcare Corporation.

140.     The conduct of the defendant and the acts that constitute liability under the Federal False Claims Act also violate 740 ILCS § 175/3 (1) in that they knowingly present or cause to be presented to an officer or employee of the State of Illinois a false or fraudulent claim for payment or approval.

141.     On information and belief the State of Illinois has made payments to the defendants on the basis of false claims submitted to Medicaid.

142.     As a result the treasury of the State of Illinois has been damaged in an amount to be proved at trial and therefore is entitled to treble

damages under the Illinois Whistleblower Protection and Award Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relators NPS and DeAngeles demand judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Dollars ($5,000.00) and Ten Thousand Dollars ($10,000.00) for each violation of 740 ILCS § 175, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 740 ILCS § 175/4(d) of the Illinois Whistleblower Protection and Reward Act or any other applicable provision of law, including any alternate remedy, for their court costs and reasonable attorneys' fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT III
## CREATION OF FALSE RECORDS IN SUPPORT OF FALSE CLAIMS TO MEDICARE
## (NMHC, NMH, NMF)

143. Relators incorporate by reference the substance of paragraphs 1 – 118 as if fully set forth herein.

144. The allegations in this count pertain to Northwestern Memorial Hospital, to its subsidiary corporation Northwestern Memorial

Foundation, and to its parent corporation, Northwestern Memorial Healthcare Corporation.

145. From 2001 to the present, NMHC, through its agent NMH, has submitted claims for payment to Medicare for patients who received inpatient and outpatient services at Northwestern Memorial Hospital.

146. From December 2001 to the date of filing of this complaint the defendants have created, or caused to be created, false records, to wit, false cost reports and false claim forms submitted to Medicare for payment.

147. The records (the cost reports at issue) were false in that they failed to disclose financial relationships that violated federal and state law, specifically:

   a. They did not truthfully disclose the nature of the relationship between NMFF and NMH with respect to the Cardiology physicians.

   b. They did not truthfully disclose the nature of the relationship between NMFF and NMH with respect to the payment of medical malpractice premiums.

   c. They did not truthfully disclose the nature of the relationship between NMFF, NMH, and the McCarthy group of cardiologists with respect to NMFF paying the McCarthy Group an amount much

44

greater than fair market value for the services of these physicians, where the payment from NMFF (a not-for-profit corporation) was being reimbursed by NMH under a "grant".

d. They did not truthfully disclose the nature of the relationship between NMH and NMFF with respect to the rent deferral and lack of facility charges for NMFF physicians using the Breast Center.

e. They did not truthfully disclose the nature of the relationships between the hospitalist employees of NMFF, NMF, and NMH with respect to the payment of 70% of the costs of the hospitalists' salaries by NMH through its foundation.

f. They did not disclose the improper relationships prohibited by Stark and the Antikickback statute.

148. Defendants thereafter presented or caused to be presented to the United States or to an officer or agent/fiscal intermediary of the United States, false claims.

149. Defendants knew, or in the exercise of reasonable care should have known that the cost reports were not true and accurate.

150. Defendants presented or caused to be presented false claims to an officer of the United States or to an agent or fiscal intermediary of the United States to obtain payment.

151. The false records (cost reports) were submitted to the government in support of these false claims.

152. As a result, the Treasury of the United States was damaged in an amount to be proved at trial and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relators NPS and DeAngeles demand judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Dollars ($5,000.00) and Ten Thousand Dollars ($10,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy, for their court costs and reasonable attorneys' fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT IV
## VIOLATION OF 740 ILCS § 175/3(2)
## (NMH, NMHC, NMF)

153. The Relators restate the allegations in Count III, *supra*, as if fully set forth herein.

154.    The allegations in this count pertain to Northwestern Memorial Hospital, to its subsidiary corporation Northwestern Memorial Foundation, and to its parent corporation, Northwestern Memorial Healthcare Corporation.

155.    The conduct of the defendant and the acts that constitute liability under the Federal False Claims Act also violate 740 ILCS § 175/3 (2) in that they knowingly made used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved.

156.    On information and belief the State of Illinois has made payments to the defendants on the basis of false claims submitted to Medicaid.

157.    As a result the treasury of the state of Illinois has been damaged in an amount to be proved at trial and therefore is entitled to treble damages under the Illinois Whistleblower Protection and Award Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relators NPS and DeAngeles demand judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Dollars ($5,000.00) and Ten Thousand Dollars ($10,000.00) for each violation of 740 ILCS § 175, et seq., for the maximum

amount allowed to the Qui Tam Plaintiff under 740 ILCS § 175/4(d) of the Illinois Whistleblower Protection and Reward Act or any other applicable provision of law, including any alternate remedy, for their court costs and reasonable attorneys' fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT V
### FALSE CLAIMS FOR CHEMOTHERAPY SERVICES TO MEDICARE
### (NMHC, NMH)

158.    Relators incorporate by reference the substance of paragraphs 1 – 118 as if fully set forth herein.

159.    The allegations in this count pertain to Northwestern Memorial Hospital and to its parent corporation, Northwestern Memorial Healthcare Corporation.

160.    Defendants provide outpatient chemotherapy services as a part of the medical care they provide to Medicare patients in Illinois.

161.    From 2001 to the present, NMFF has submitted claims for payment to Medicare for patients who received inpatient and outpatient chemotherapy services at Northwestern Memorial Hospital.

162.    A significant portion of those bills were false or fraudulent in that the bills did not properly state the amount of medication actually provided to the Medicare beneficiaries.

48

163. The last patient every day who received chemotherapy services received the medically-prescribed amount of chemotherapy for their condition.

164. The bill sent by Northwestern Medical Faculty Foundation to Medicare, Medicaid, and private insurers often charged a higher amount of chemotherapy than that given in order to bill for substantially all the chemotherapy medication in a particular chemotherapy vial.

165. For example, if there are two patients receiving a particular drug that is supplied in a vial of 300 mg, and one patient gets 120 mg, and the other 150, the last patient at the end of the day would be billed for 180 mg, instead of the 150 that she actually received.

166. Relators are aware of defendant charging private insurers in this manner and on information and belief asserts that the defendant is charging Medicare, Medicaid, Champus/Tricare and the Federal Employees Health Plan in the same manner.

167. Patient accounts representatives have admitted to this being the reason that chemotherapy bills do not represent the actual amount of chemotherapy provided.

168. Therefore NMFF knows that it is submitting information to Medicare, Medicaid, Champus/Tricare and the Federal Employees Health Plan that is false.

169. NMFF is presenting or causing to be presented false claims to an officer, agent or fiscal intermediary of the United States for payment.

170. NMFF has received payments from the United States.

171. The Treasury of the United States has thereby been damaged in an amount to be proved at trial, and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relators NPS and DeAngeles demand judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Dollars ($5,000.00) and Ten Thousand Dollars ($10,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy, for their court costs and reasonable attorneys' fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

**COUNT VI**
**VIOLATION OF 740 ILCS § 175/3(1)**
**(NMHC, NMH)**

172.   The Relators restate the allegations in Count V, *supra*, as if fully set forth herein.

173.   The allegations in this count pertain to Northwestern Memorial Hospital and to its parent corporation, Northwestern Memorial Healthcare Corporation.

174.   The conduct of the defendant and the acts that constitute liability under the Federal False Claims Act also violate 740 ILCS § 175/3 (1) in that they knowingly presented or caused to be presented to an officer or employee of the State of Illinois a false or fraudulent claim for payment or approval.

175.   On information and belief the State of Illinois has made payments to the defendants on the basis of false claims submitted to Medicaid.

176.   As a result the treasury of the State of Illinois has been damaged in an amount to be proved at trial and therefore is entitled to treble damages under the Illinois Whistleblower Protection and Award Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relators NPS and DeAngeles demand judgment against the defendants jointly and severally in the amount of three times the

51

overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Dollars ($5,000.00) and Ten Thousand Dollars ($10,000.00) for each violation of 740 ILCS § 175, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 740 ILCS § 175/4(d) of the Illinois Whistleblower Protection and Reward Act or any other applicable provision of law, including any alternate remedy, for their court costs and reasonable atttorneys' fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT VII
## FALSE RECORDS IN SUPPORT OF FALSE CLAIMS FOR CHEMOTHERAPY SERVICES TO MEDICARE
## (NMHC, NMH)

177.    Relators incorporate by reference the substance of paragraphs 1 – 118 as if fully set forth herein.

178.    The allegations in this count pertain to Northwestern Memorial Hospital and to its parent corporation, Northwestern Memorial Healthcare Corporation.

179.    Defendants created false records in that the billing statements sent to Medicare, Medicaid, Champus/Tricare and the Federal Employees Health Plan falsely stated the number of units or amounts of chemotherapy provided to the patient.

180. The records were created in support of false claims submitted or caused to be submitted by defendant to the United States.

181. Those claims were presented to an officer, agent, or fiscal intermediary of the United States for payment.

182. The false records were made knowingly to support false bills generated to the health care plans referenced in paragraph 142.

183. Medicare, Medicaid, Champus/Tricare and the Federal Employees Health Plan paid the false invoices for chemotherapy services provided in an amount greater than was actually provided.

184. The Treasury of the United States has thereby been damaged in an amount to be proved at trial, and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relators NPS and DeAngeles demand judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Dollars ($5,000.00) and Ten Thousand Dollars ($10,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy, for their court costs and reasonable attorneys' fees at

prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT VIII
### VIOLATION OF 740 ILCS § 175/3(2)
### (NMHC, NMH)

185. The Relators restate the allegations in Count VII, *supra*, as if fully set forth herein.

186. The allegations in this count pertain to Northwestern Memorial Hospital and to its parent corporation, Northwestern Memorial Healthcare Corporation.

187. The conduct of the defendant and the acts that constitute liability under the Federal False Claims Act also violate 740 ILCS § 175/3 (2) in that they knowingly made used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved.

188. On information and belief the State of Illinois has made payments to the defendants on the basis of false claims submitted to Medicaid.

189. As a result the treasury of the state of Illinois has been damaged in an amount to be proved at trial and therefore is entitled to treble damages under the Illinois Whistleblower Protection and Award Act,

to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relators NPS and DeAngeles demand judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Dollars ($5,000.00) and Ten Thousand Dollars ($10,000.00) for each violation of 740 ILCS § 175, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 740 ILCS § 175/4(d) of the Illinois Whistleblower Protection and Reward Act or any other applicable provision of law, including any alternate remedy, for their court costs and reasonable attorneys' fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT IX
## CONSPIRACY TO SUBMIT FALSE CLAIMS TO MEDICARE
## (NMHC, NMH, NMFF)

190. Relators incorporate by reference the substance of paragraphs 1 – 118 as if fully set forth herein.

191. The allegations in this count pertain to all defendants.

192. NMHC, NMH, NMFF, and NMF and the individual defendants named herein entered into agreements between the parties.

55

193. NMHC orchestrated, planned and negotiated the terms of the agreement in coordination with NMH and NMF and the individual defendants named herein.

194. NMFF participated in the negotiation of the agreements.

195. The agreements consisted of the following specific ventures and schemes:

    a. NMFF and NMH, with the blessing of NMHC, entered into an agreement where NMH, through its foundation, NMF, would pay money to NMFF to reimburse its loss in a medical malpractice case.

        i. The agreement included payments that were well above the amount of the loss.

        ii. The payments were instituted to influence referrals and payments for services rendered by NMH for Medicare, Medicaid, Tricare-Champus and FEHP beneficiaries.

        iii. The surpluses of the payments were used to reward individual physicians in the form of unlawful bonus payments for referrals.

    b. NMFF and NMH, again with the blessing of NMHC, entered into an agreement where NMH, through its foundation, NMF, would pay money to NMFF to reimburse any potential loss associated with

56

the $50,000,000 contract entered into between the McCarthy cardiology group and NMFF.

    i.   The agreement included payments in the form of a guarantee of the physicians salary plus $1, or what the parties termed the "delta factor plus one."

    ii.  The purpose of the agreement was a payment in cash to NMFF in exchange for physicians performing services at NMH that would be paid for by Medicare, Medicaid, CHAMPUS/Tricare and FEHP.

   c.  NMFF and NMH, again with the blessing of NMHC, entered into an agreement where NMH, through its foundation, NMF, would pay money to NMFF in an amount equal to seventy percent (70%) of the salaries of NMFF hospitalists as a means of controlling the medical decision-making and resource allocation of services provided to Medicare, Medicaid, CHAMPUS/Tricare and FEHP patients.

196.  The purpose and objective of the agreements entered into in secret between NMFF, NMH, NMF and NMHC was to obfuscate to the degree possible the relationships of control and direction being exercised by NMHC and NMH over the physicians employed by NMFF, and to narrowly restrict their medical decision-making and resource

allocation decisions in the care of patients whose bills were being paid by Medicare, Medicaid, CHAMPUS/Tricare and FEHP.

197. From the perspective of NMFF physicians, their purpose was to extend, to the degree possible, the amount of control over the practice of medicine at Northwestern Memorial Hospital by extending exclusivity agreements open only to NMFF physicians and excluded from being offered to private physicians who were also on staff at NMH.

198. NMHC took steps in furtherance of the conspiracy by directing its subsidiary corporation to engage in negotiations with NMFF and its physician management.

199. NMH took steps in furtherance of the conspiracy by:

   a. Directing its subsidiary corporation, NMF, to make payments in the form of grants to NMFF ostensibly for medical malpractice insurance.

   b. Directing its subsidiary corporation, NMF, to make payments in the form of grants to NMFF ostensibly for the purpose of preventing NMFF from incurring a loss in the recruitment of the McCarthy cardiology physicians.

    c.  Directing its subsidiary corporation, NMF, to make payments in the form of grants to NMFF ostensibly for payment of seventy percent (70%) of the costs of the hospitalists.

200.    NMFF took steps in furtherance of the agreements by accepting payments and directing its physicians to comply with certain requests from NHM.

201.    The common overall purpose of the agreement and conspiracy was to permit the submission of false claims for payment to Medicare, Medicaid, CHAMPUS/Tricare and FEHP.

202.    The agreements and conspiracy were entered into with the intent to defraud the United States.

203.    The Treasury of the United States has thereby been damaged in an amount to be proved at trial, and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relators NPS and DeAngeles demand judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Dollars ($5,000.00) and Ten Thousand Dollars ($10,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the

False Claims Act or any other applicable provision of law, including any alternate remedy, for their court costs and reasonable attorneys' fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT X
## VIOLATION OF 740 ILCS § 175/3(3)
### NMHC, NMH, NMFF, NMF

204. The Relators restate the allegations in Count IX, *supra*, as if fully set forth herein.

205. The allegations in this count pertain to all defendants.

206. The conduct of the defendants and the acts that constitute liability under the Federal False Claims Act also violate 740 ILCS § 175/3 (3) in that defendants conspired to get a false or fraudulent claim paid or approved.

207. On information and belief the State of Illinois has made payments to the defendants on the basis of false claims submitted to Medicaid.

208. As a result the treasury of the State of Illinois has been damaged in an amount to be proved at trial and therefore is entitled to treble damages under the Illinois Whistleblower Protection and Award Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relators NPS and DeAngeles demand judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand Dollars ($5,000.00) and Ten Thousand Dollars ($10,000.00) for each violation of 740 ILCS § 175, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 740 ILCS § 175/4(d) of the Illinois Whistleblower Protection and Reward Act or any other applicable provision of law, including any alternate remedy, for their court costs and reasonable attorneys' fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT XI
## VIOLATION OF INSURANCE CLAIMS FRAUD PREVENTION ACT
## 740 ILCS § 92/1, ET SEQ. (NMHC, NMH)

209.   Relators incorporate by reference the substance of Paragraphs 1 through 20 as if fully set forth herein.

210.   Relators incorporate by reference the substance of Paragraphs 71 through 127 as if fully set forth herein.

211.   The allegations in this Count pertain to Northwestern Memorial Hospital and to its parent corporation, Northwestern Memorial Healthcare Corporation.

212. This Count is brought for and on behalf of the People of the State of Illinois by the Relators herein to recover damages and penalties arising from the submission of false claims to private insurers and to prevent the Defendants from committing further violations of the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS § 92/1, et seq. ("Insurance Fraud Act"). The claims submitted were false in that the bills were submitted in violation of the antikickback statutes.

213. The State of Illinois has a profound interest in protecting its citizens from unnecessary, overpriced and self-interested kickback referrals by medical service providers, which can lead to inappropriate medical procedures and excessive medical service costs. The State of Illinois also has a profound interest in detecting and prosecuting consumer and insurance fraud and in protecting the citizens of this State from such fraud. These interests are codified in the Insurance Fraud Act.

214. Plaintiff Relators are private persons interested in the matter and are authorized and empowered to enforce the Insurance Fraud Act by § 92/15 of the Act, which provides "An interested person...may bring a civil action under this Act." 740 ILCS § 92/15.

215. The Insurance Fraud Act provides a civil cause of action against any person who engages in a payment kickback to a referring source for

the referral of a patient or client when a claim for the services is made to an insured person or his/her insurance company. It provides:

> Except as otherwise permitted or authorized by law, it is unlawful to knowingly offer or pay any remuneration, directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be a basis for a claim against an insured person or the person's insurer. 740 ILCS § 92/5.

216. Section 92/5(b) of the Insurance Fraud Act provides that persons who violate § 92/5(a) or violate the additional insurance fraud provisions at 720 ILCS § 5/46-1 of the Illinois Criminal Code, are subject to the civil penalties set forth therein.

217. Upon information and belief, the aforementioned conduct of the Defendants not only involves illegal kickbacks but is false claim billing prohibited by 720 ILCS § 5/46-1 which provides insurance claim fraud occurs when a person:

> Knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company. 720 ILCS § 5/46-1.

218. Upon information and belief, by the aforementioned conduct the Defendants violates 740 ILCS § 92/5(a) and (b).

63

219. Upon information and belief, private insurers, unaware of Defendants' fraudulent acts, paid many claims submitted to them in connection with said acts.

220. Upon information and belief, insured patients were also subject to Defendants' fraudulent acts by being billed co-pay and uncovered charges for the false billings and claims.

221. As a result of the foregoing, the State of Illinois and its citizens have been damaged in a significant amount. The exact dollar amount is not readily ascertainable by Plaintiffs as the books and records for these billings and claims are within the Defendants' exclusive control and an accounting is required to determine the full damages and harm caused.

WHEREFORE, Plaintiffs respectfully request this Court: (1) enter a judgment in their favor and against the Defendants; (2) enter a temporary restraining order and thereafter, a permanent injunction pursuant to 740 ILCS § 92/5(b) against the Defendants to protect the public and prevent further harm and to prevent dissipation of illegal proceeds; (3) compel an accounting from Defendants, and (4) award the following damages to the following parties, and against the Defendants:

To the State of Illinois, insurers and the public:

a. Disgorgement of money received by the Defendants through the submission of false claims;

b. Three times the amount of each false claim Defendants submitted and caused to be submitted under a contract of insurance;

c. An Order permanently enjoining Defendants from conducting the aforementioned fraud and kickback payments;

d. A civil penalty of not less than $5,000 and not more than $10,000 for each false claim the Defendants submitted or caused to be submitted under a contract of insurance;

e. An award of reasonable attorneys' fees incurred by the State, insurers, these Relators or the public;

f. Prejudgment interest; and

g. All expenses and costs of this action.

To Relators, Northwestern Physicians and Surgeons, LLC and Steven J. DeAngeles, M.D.:

a. An amount not less than thirty (30%) percent of this action pursuant to 740 ILCS § 92/25;

b. Reimbursement of all expenses Relators incurred in connection with this action;

c. An award of reasonable attorneys' fees;

d. Prejudgment interest;

e. All expenses and costs of this action; and

f. Such further relief the Court deems just and proper.

## COUNT XII
### VIOLATION OF CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS § 505/1, ET SEQ (NMHC, NMH)

222. Relators incorporate by reference the substance of Paragraphs 1 through 20 as if fully set forth herein.

223. Relators incorporate by reference the substance of Paragraphs 71 through 127 as if fully set forth herein.

224. The allegations in this Count pertain to Northwestern Memorial Hospital and to its parent corporation, Northwestern Memorial Healthcare Corporation.

225. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") declares unlawful "any (u)nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact . . . in the conduct of any

66

trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS § 505/2.

226.  The Defendants provided the aforementioned undisclosed financial incentives to physicians in its captive physician group in order to induce referrals to their own healthcare facilities.

227.  The combined effect of the aforementioned unrestricted grants for payment of medical malpractice premiums, payment for cardiology recruitment, rent deferral for breast center physicians and remuneration for hospitalists is a deceptive scheme of "grants" which effectively allows Northwestern Healthcare Corporation (including the hospital and foundation) to capture all of the profitable referrals for its hospitals and specialty centers from its captive physician group.

228.  This deceptive and undisclosed referral scheme and the aforementioned practice of payments for hospitalists increase the cost of healthcare for consumers.  Therefore, this business arrangement has a direct public impact on consumers.

229.  In addition, the aforementioned deceptive and fraudulent overbilling by the Defendants for chemotherapy and recovery room time increases the cost of healthcare for consumers.  Therefore, this business practice has a direct public impact on consumers.

67

230.    The Defendants engaged in unfair and deceptive methods of competition and in deceptive acts and practices by the aforementioned acts, which include undisclosed financial incentives, referrals, fraudulent overbilling and increased billings through hospitalizations and ancillary procedures where the conflict of interest is undisclosed, compounded by an intent to eliminate competition.

231.    The Defendants failed to disclose the aforementioned schemes to their patients or their insurers.

232.    In addition, Plaintiffs' own businesses have been damaged as a result of these actions by the Defendants.

233.    The aforementioned business schemes are in each instance a deception, fraud and misrepresentation upon both the patients and insurers involved.

234.    Upon information and belief, by committing the acts alleged above, the Defendants violated Sec. 2 of the CFA by engaging in unfair and/or deceptive practices, including, but not limited to, the misrepresentation, concealment, suppression or omission of material facts, while participating in trade or commerce with the knowledge and/or intent that the patients, insurers and others in the State of Illinois would rely on their deceptive conduct.

68

235.  The Relators bring this count on behalf of the People of the State of Illinois as a taxpayer action, for the public benefit under Sec. 7 of the CFA, and in addition for themselves as injured persons under Sec. 10a of the CFA (815 ILCS § 505/10a).

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in favor of Relators and the People of the State of Illinois and further:

a.  Declare that the Defendants' conduct as described above constitutes fraud and unfair and/or deceptive acts or practices within the meaning of § 2 of the CFA;

b.  Permanently enjoin the Defendants and their employees, officers, directors, agents, successors, assigns, affiliates, parent or controlling entities, subsidiaries and any and all persons acting in concert or participation with the Defendants, from continuing the unlawful conduct, acts and practices described above;

c.  Award the People of the State of Illinois and Relators restitution and actual damages;

d.  Award penalties for each violation found by the Court to have been committed by the Defendants with the intent to defraud pursuant to 815 ILCS § 505/7(6), and penalties for each violation found by the Court to have been committed against a person 65 years of age or older pursuant to 815 ILCS 505/7(c);

e.  Award the State of Illinois and Relators attorneys' fees and costs in

bringing this cause of action; and

f.  Such further relief the Court deems just and proper.

Respectfully submitted,

/s/Phillip Taxman
Phillip Taxman, Ltd.
680 N. Lake Shore Drive
#1122
Chicago, IL 60611
(312) 263-3040


Dean M. Trafelet, Esq.
50 W. Schiller
Chicago, IL 60606
(312) 335-1726


Harry Huge
DC Bar #55640 and SC Bar #2777
Pro Hac Vice
The Huge Law Firm PLLC
25 East Battery Street
Charleston SC 29401
Tel No 843 722 1628
Fax No 843 720 8794


Edward D. Robertson MO # 27183
Mary D. Winter MO #38328
Anthony L. DeWitt MO #41612
Pro Hac Vice
Bartimus, Frickleton, Robertson & Gorny, P.C.
715 Swifts Highway
Jefferson City, Missouri 65109
Telephone No.: (573) 659-4454
Facsimile No.: (573) 659-4460

ATTORNEYS FOR RELATORS

70

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues for which a jury is available.

Respectfully submitted,

/s/Phillip Taxman
Phillip Taxman, Ltd.
680 N. Lake Shore Drive, #1122
Chicago, IL 60611
(312) 263-3040
ATTORNEYS FOR RELATORS

71

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 30th day of July, 2009, copies of the foregoing First Amended Complaint were served on the individuals below by placing the same in the United States Mail, first class postage affixed, and addressed to Patrick J. Fitzgerald, Esq., Hon. Eric H. Holder, Jr., Esq., and Anita Alvarez, Esq., at the addresses below:

Patrick J. Fitzgerald, Esq.
United States Attorney for the Northern District of Illinois,
Eastern Division
United States Federal Courthouse
219 S. Dearborn, 5th Floor
Chicago, IL 60604

Hon. Eric H. Holder Jr., Esq.
Attorney General of the United States
5111 Main Justice Building
10th & Constitution Ave. N.W.
Washington, DC 20210

Anita Alvarez, Esq.
Cook County State's Attorney
C/O Patrick A. Driscoll, Esq.
Chief – Civil Actions Bureau
500 Richard J. Daley Center
Chicago, IL 60602

/s/Phillip Taxman
Phillip Taxman, Ltd.
680 N. Lake Shore Drive, #1122
Chicago, IL 60611
(312) 263-3040
Attorney for Relators